904 P.2d 517

**In re TAX APPEAL OF FUJI PHOTO FILM HAWAII, INC., Taxpayer–Appellee.**

**No. 17264.**

Supreme Court of Hawai'i.

Oct. 9, 1995.

Gary S. Ige, Deputy Attorney General, Honolulu, for Director of Taxation/appellant.

Kenneth G.K. Hoo (Calvert G. Chipchase, Eric T. Kawatani, and Peter J. Hamasaki with him on the brief of McCorriston Miho Miller Mukai), Honolulu, and Philip M. Moilanen, pro hac vice, of Bullen, Moilanen, Klaassen & Swan, P.C., Jackson, MI, for Fuji Photo Film Hawaii, Inc./appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

KLEIN, Justice.

The question in this appeal by the Department of Taxation from the Tax Appeal Court is whether the "photoprocessing" activities of Fuji Photo Film Hawaii, Inc. (Fuji) constitute "manufacturing," which is taxable at the rate of one-half of one percent, or a "service," which is taxable at the rate of four percent. We agree with the Tax Appeal Court's conclusion that the Director of Taxation's (Tax Director) assessment of taxes on the taxpayer's income at the higher rate was inconsistent with the General Excise Tax Law and the Use Tax Law.

## I. BACKGROUND

The facts in this case are uncontroverted. For the period from October 1, 1987 through September 30, 1990, Fuji reported $174,026.88 in total taxes owed (including monthly, quarterly or semiannual payments already made) based on revenues derived from (1) wholesale and retail photoprocessing operations, and (2) the sale of color print paper and developing chemicals to "minilabs" that are also engaged in photoprocessing operations.[1]

## A. The Photo Processing Operation

Fuji's cross-motion for summary judgment included affidavits by George Otsuka, Fuji's General Manager and Treasurer, and Takeshi Masuyama, Fuji's Technical Advisor. According to both affiants, the color film processing currently performed by Fuji is "drastically different" from the older process used in making black and white prints. In the old process, no dyes were transferred and there was less transformation of the film. Otsuka suggests that from 1935 to 1957, color film processing of amateur film was limited to plants owned by Eastman Kodak Company because the film was sold with processing by Kodak included in the purchase price; furthermore, "virtually all photographic process-

ing done by firms other than Kodak was limited to black and white film or certain sizes of professional film."[2]

Fuji's processing of both film and paper results in the transfer of chemicals onto the finished negative and print. Reactive color development chemicals in the film processing equipment first create a black and white, metallic-silver image in the film. Color development compounds are then added; these chemicals react with colorless dye couplers to create a color dye image. Bleach and fix solutions then remove the black and white image, leaving behind only the color dye image.

A printer then projects light through this negative image, exposing the photographic paper and triggering the formation of invisible atoms of metallic silver (a "blueprint") on the surface of the photographic paper's nonmetallic silver halide grains. Next, the color developer acts on the exposed silver halide grains to create a physical black and white silver image where only the "blueprint" existed before. Color development compounds then combine and react with colorless dye couplers to create a color dye image. Finally, bleach and fix solutions remove the black and white silver image (by making it soluble and then dissolving it away, to be recovered later as metal), leaving behind only the color dye image.

Just under seventy percent of the chemicals used in Fuji's developing process are transferred to the film and paper. According to both affiants, "there is a complete change in the makeup of the film when it is converted to a negative, and in the paper when it is processed." (Emphasis added.) The customer's previously valueless, undeveloped film, is returned as "new property" whose only common characteristic with the original film is the acetate base upon which the "picture" is carried. "The film developing process adds dyes, stabilizers and har-

---

1. Although the machinery used by the minilabs generally differs from that of Fuji due to economies of scale, the parties agree that the developing and printing process is essentially "the same as that accomplished by Fuji's Honolulu plant"—in other words, they use the same chemicals and paper. Therefore, the parties further agree that

these businesses should be treated similarly for excise and use tax purposes.

2. Otsuka asserted that "the tax treatment of black and white film processing in earlier days, such as 1947, has no factual relationship to photo processing by the industry today."

deners to the film base, while silver halide, emulsion layers, antihilation backing, and other materials are removed." Masuyama added that "[t]he film is converted from a chemically unstable substance [which 'has a very limited life span'] to a stable, useful article."

### B. *Competing Tax Classifications*

#### 1. *Fuji's Tax Reports*

For the Fiscal Years Ending (FYE) in 1988, 1989, and 1990, respectively, Fuji reported the following revenues and imports subject to taxation under HRS chapters 237 (General Excise, or "G.E." Tax) and 238 (Use Tax):

| TAX CATEGORY | (rate) | FYE 9/30/88 | (tax) |
|---|---|---|---|
| G.E. Tax: | | | |
| wholesaling | (.005) | $7,623,282.03 | ($38,116.41) |
| retailing | (.040) | $197,769.93 | ($7,910.80) |
| interest | (.040) | $15,782.24 | ($631.29) |
| other rentals | (.040) | $15,000.00 | ($600.00) |
| others | (.040) | $4,298.76 | ($171.95) |
| Use Tax: | | | |
| imports for resale | (.005) | $259,305.35 | ($1,296.53) |
| consumption | (.040) | $36,008.66 | ($1,440.35) |

| TAX CATEGORY | (rate) | FYE 9/30/89 | (tax) |
|---|---|---|---|
| G.E. Tax: | | | |
| wholesaling | (.005) | $8,715,098.62 | ($43,575.49) |
| retailing | (.040) | $249,772.08 | ($9,990.88) |
| interest | (.040) | $9,684.54 | ($387.38) |
| other rentals | (.040) | $15,000.00 | ($600.00) |
| others | (.040) | $4,298.76 | ($171.95) |
| Use Tax: | | | |
| imports for resale | (.005) | $261,488.79 | ($1,307.44) |
| consumption | (.040) | $36,008.66 | ($1,440.35) |

| TAX CATEGORY | (rate) | FYE 9/30/90 | (tax) |
|---|---|---|---|
| G.E. Tax: | | | |
| wholesaling | (.005) | $9,603,154.97 | ($48,015.77) |
| retailing | (.040) | $241,867.23 | ($9,674.69) |
| interest | (.040) | $9,596.64 | ($383.88) |
| other rentals | (.040) | $15,000.00 | ($600.00) |
| others | (.040) | $0.00 | ($0.00) |
| Use Tax: | | | |
| imports for resale | (.005) | $339,343.40 | ($1,696.72) |
| consumption | (.040) | $96,786.10 | ($3,871.44) |

Accordingly, Fuji reported that it owed the following taxes:

| | FYE 9/30/88 | FYE 9/30/89 | FYE 9/30/90 |
|---|---|---|---|
| Ch. 237: | $47,430.45 | $54,578.54 | $58,674.34 |
| Ch. 238: | $2,736.88 | $5,038.51 | $5,568.16 |
| Total | $50,167.33 | $59,617.05 | $64,242.50 |

TOTAL = $174,026.88

Based on its belief that "photoprocessing" constitutes a manufacturing activity as opposed to a service activity, Fuji included two types of sales in the "wholesaling" category: 1) photoprocessing sales to drug stores, supermarkets and other retailers, *see* HRS §§ 237–4(1) and –13(1) (Supp.1992) (taxing wholesale sales at the rate of one-half of one percent) [3]; and 2) sales of color print paper and developing chemicals to minilabs. HRS §§ 237–4(2) and –13(1), *supra* note 3. Fuji considered its imports of color print paper and developing chemicals for use in its own photoprocessing operations to be imports for use in manufacturing. Accordingly, Fuji concluded that these imports were (i) not taxable to the extent used to manufacture products sold at wholesale, *see* HRS § 238–

**3.** HRS § 237–4 provides in pertinent part:

"[w]holesaler" or "jobber" applies only to a person making sales at wholesale. Only the following sales are at wholesale:

(1) Sales to a licensed retail merchant, jobber, or other licensed seller for purposes of resale;

(2) Sales to a licensed manufacturer of material or commodities which are to be *incorporated by the manufacturer into a finished or saleable product* (including the container or package in which the product is contained) during the course of its preservation, manufacture, or processing, including preparation for market, and *which will remain in such finished or saleable product in such form as to be perceptible to the senses*, which finished or saleable product is to be *sold and not otherwise used by the manufacturer*[.]

(Emphases added.)

HRS § 237–13 provides in pertinent part:

There is hereby levied and shall be assessed and collected annually privilege taxes against persons on account of their business and other activities in the State measured by the application of rates against values of products, gross proceeds of sales, or gross income, whichever is specified, as follows:

(1) Tax on Manufacturers.

(A) Upon every person engaging or continuing within the State in the *business of manufacturing, including* compounding, canning, preserving, packing, *printing*, milling, *processing*, refining, *or preparing for sale*, profit, or commercial use, either directly or through the activity of others, in whole or in part, any article or articles, substance or substances, commodity or commodities, the amount of the tax to be equal to the value of the articles, substances, or commodities, manufactured, compounded, canned, preserved, packed, printed, milled, processed, refined, or prepared, for sale, as shown by the gross proceeds derived from the sale thereof by the manufacturer or person compounding, preparing, or printing them, multiplied by one-half of one per cent.

(Emphases added.)

2(1)(B) (1985),[4] and (ii) taxable at the rate of one-half of one percent to the extent used to manufacture products sold at retail. *See* HRS § 238–2(2)(B), *supra* note 4. To the extent that Fuji imported color print paper and developing chemicals for resale to the minilabs, Fuji maintained that it had already accounted for this activity through its calculation of sales at wholesale; therefore, Fuji concluded that these imports were not subject to use tax. *See* HRS § 238–2(1)(A) (1985).[5]

**4.** HRS § 238–2 provides in pertinent part:

[t]here is hereby levied an excise tax on the use in this State of tangible personal property which is *imported*, or purchased from an unlicensed seller, *for use in this State.* The tax imposed by this chapter shall accrue when the property is acquired by the importer or purchaser and becomes subject to the taxing jurisdiction of this State. The rates of the tax hereby imposed and the exemptions thereof are as follows:
(1) If the importer or purchaser is licensed under chapter 237 and is ... (B) a manufacturer importing or purchasing material or commodities which are to be *incorporated by the manufacturer into a finished or saleable product* (including the container or package in which the product is contained) wherein it will remain in such form as to be perceptible to the senses, and which finished or saleable product is to be *sold in such manner as to result in further tax on the activity of the manufacturer as the manufacturer or as a wholesaler, and not as a retailer, there shall be no tax,* provided that if the wholesaler ... or manufacturer is also engaged in business as a retailer (so classed under chapter 237), paragraph (2) shall apply to the wholesaler ... or manufacturer, but the director of taxation shall refund to the wholesaler ... or manufacturer, in the manner provided under section 231–23(d) such amount of the tax as the wholesaler ... or manufacturer ... paid ... with respect to property which has been used by the wholesaler ... or manufacturer for the purposes stated in this paragraph.
(2) If the importer or purchaser is ... (B) a manufacturer [as described in section (1)(B) above, whose] product is to be sold at retail in this State, in such manner as to result in a further tax on the activity of the manufacturer in selling such products at retail, ... the tax shall be one-half of one per cent of the purchase price of the property if the purchase and sale are consummated in Hawai'i; or, if there is no purchase price applicable thereto, or if the purchase or sale is consummated outside of Hawai'i, then one-half of one per cent of the value of such property.
(Emphases added.)

## 2. *Department of Taxation's Assessment*

The Department of Taxation assessed Fuji an additional $98,437.31 (plus interest)[6] after reclassifying the photoprocessing activity as a "service" rather than as "manufacturing." Consequently, the Department of Taxation took the position that the tax filings submitted by Fuji had: 1) *overreported* its wholesaling activities, *see* HRS § 237–13(2)(A) (Supp. 1992)[7]; 2) *failed to report* services provided for an intermediary—i.e., gross receipts from

**5.** HRS § 238–2(1)(A) applies to "a wholesaler or jobber importing or purchasing for the purposes of resale[.]"

**6.** The final notice of assessment was originally issued on January 29, 1992; thereafter, on June 17, 1992, Fuji Film paid $117,135.68 (including additional interest) under protest.

**7.** HRS § 237–13(2)(A) provides in pertinent part:

Tax on business of selling tangible personal property; producing.... Upon every person engaging or continuing in the business of selling any tangible personal property whatsoever ... there is likewise hereby levied, and shall be assessed and collected, a tax equivalent to four per cent of the gross proceeds of sales of the business; provided that insofar as certain retailing is taxed by section 237–16, the tax shall be that levied by section 237–16, and *in the case of a wholesaler, the tax shall be equal to one-half of one per cent of the gross proceeds of sales of the business.* Upon every person engaging or continuing within this State in the business of a producer the tax shall be equal to one-half of one per cent of the gross proceeds of sales of the business[.]
(Emphasis added.) *See infra* note 11 (quoting from HRS § 237–16). HRS § 237–13(2)(D) provides that:
[w]hen a manufacturer or producer, engaged in such business in the State, *also is engaged in selling his products in the State at wholesale, retail or in any other manner,* the tax for the privilege of engaging in the business of selling the products in the State shall apply to him *as well as* the tax for the privilege of manufacturing or producing in the State, and he shall make the returns of the gross proceeds of the wholesale, retail, or other sales required for the privilege of selling in the State, as well as making the returns of the value or gross proceeds of sales of his products required for the privilege of manufacturing or producing in the State. He shall pay the tax imposed in this chapter at the *highest rate applicable for any of the privileges exercised by him in respect of the particular products,* and the value or gross proceeds of sales of the products, thus subjected to tax at the highest rate, *may be deducted insofar as duplicated as to the same products by the*

photoprocessing activities with stores and supermarkets—*see* HRS § 237–7 (1985) (defining "service business or calling") and HRS § 237–13(6) (Supp.1992) (indicating that such service businesses are taxable at the rate of four percent, or .040)[8]; 3) *underreported* its retailing activities—i.e., sales of color print paper and chemicals to minilabs, which consumed the property in a service business—*see* HRS §§ 237–16(a)(1) & (b) (Supp.1992)[9]; 4) *failed to report* services provided through direct dealings with United States government agencies, prepaid mailers, and other customers, *see* HRS § 237–13(6) (Supp.1992) (indicating that such services are taxable at the rate of one-half of one percent, or .005); and 5) *underreported* its imports for consumption—i.e., its use of color print paper and developing chemicals in a service activity (photoprocessing). *See* HRS § 238–2(3) (1985).[10]

After recalculating the total taxes owed, the Department of Taxation assessed Fuji the following amounts remaining due:

|  | FYE 9/30/88 | FYE 9/30/89 | FYE 9/30/90 |
|---|---|---|---|
| Ch. 237: | $5,475.49 | $6,580.02 | $9,985.83 |
| Ch. 238: | $20,228.06 | $28,082.79 | $28,085.12 |
| Interest as of 10/31/91: | $5,654.81 | $4,852.83 | $2,284.26 |
| Total | $31,358.36 | $39,515.64 | $40,355.21 |

TOTAL = $111,229.21

Adding $5,906.47 in interest accrued after the final notice of assessment and prior to payment, Fuji eventually paid $117,135.68 to the Department of Taxation under protest. *See supra* note 6.

### C. The Tax Appeal Court's Decision

The Tax Appeal Court found that "the modern trend in many jurisdictions across the United States has been to recognize that photoprocessing is a manufacturing activity and old conceptions of photoprocessing as a service activity are no longer valid." Furthermore, after considering the information

---

*measure of the tax upon him for the other privileges* enumerated in this paragraph (2), paragraph (1), and section 237–16. (Emphases added.)

8. HRS § 237–7 provides:

"Service business or calling" includes all activities engaged in for other persons for a consideration which involve the rendering of a service as distinguished from the sale of tangible property or the production and sale of tangible property. "Service business or calling" does not include the services rendered by an employee to the employee's employer.

HRS § 237–13(6) provides:

Tax on service business. Upon every person engaging or continuing within the State in any *service business or calling not specifically taxed under this chapter,* there is likewise hereby levied and shall be assessed and collected a tax equal to four per cent of the gross income of any such business; provided, however, where any person engaging or continuing within the State in any service business or calling *renders such services upon the order of or at the request of another taxpayer who is engaged in the service business and who, in fact, acts as or acts in the nature of an intermediary between the person rendering such services and the ultimate recipient of the benefits of such services, so much of the gross income as is received by the person rendering the services shall be subjected to the tax at the rate of one-half of one per cent and all of the gross income received by the intermediary from the principal shall be subjected to a tax at the rate of four per cent.*

(Emphases added.)

9. HRS § 237–16 provides in pertinent part:

**Tax on certain retailing.** (a) This section relates to certain retailing in the State as follows:

(1) This section relates to the *sale of tangible personal property, for consumption or use by the purchaser and not for resale ... and the rendering of services by one engaged in a service business or calling, as defined, to a person who is not purchasing the services for resale,* but does not relate to the sale ... of tangible personal property or the rendering of services to the State, its political subdivisions or agencies or instrumentalities of the State or a political subdivision, or to the United States or its agencies or instrumentalities (other than national banks)....

....

(b) There is hereby levied, and shall be assessed and collected annually, a privilege tax against persons engaging or continuing within the State in the retailing to which this section relates, on account of such retailing activities, as set forth in subsection (a), equal to *four per cent of the gross proceeds of sale or gross income received or derived from such retailing.* Persons on whom a tax is imposed by this section hereinafter are called "retailers".

(Emphasis added.)

10. HRS § 238–2(3) provides that "[i]n all other cases," the use of tangible personal property in this State which is imported, or purchased from an unlicensed sell shall be taxed at the rate of "four per cent of the value of the property."

presented in sections I.A. and B., *supra*, the court concluded that "the photoprocessing operations of Fuji Photo Film Hawaii, Inc. constitute 'manufacturing.'"

## II. *DISCUSSION*

Although dictum in *In re Photo Management, Inc.*, 63 Haw. 579, 583–84, 633 P.2d 535, 538 (1981), suggests that "photofinishing"[11] is a service activity taxable under HRS § 237–13(6), we have not expressly held that "photoprocessing" or "photofinishing" is a "service business or calling" under HRS § 237–7. *See supra* note 8. Nor have we decided whether "photoprinters" are covered by the intermediary services provisions of current Hawai'i tax law. *Compare* HRS § 237–13(6) *with* Revised Laws of Hawai'i (RLH) (1955, as amended), § 117–16(c) *infra.*

■ The interpretation of a statute is a question of law, which this court reviews under the right/wrong standard. *Pacific Int'l Services Corp. v. Hurip,* 76 Hawai'i 209, 216, 873 P.2d 88, 95 (1994). *See also Tax Appeal of United Meat Company, Ltd.,* 69 Haw. 125, 735 P.2d 935 (1987) (rejecting taxpayer's characterization of its "service business" as a "manufacturing" enterprise taxable under HRS § 237–13(1)). Because the "modern trend" in other jurisdictions is not necessary to our determination that photoprocessing is a manufacturing activity under Hawai'i law, for the reasons discussed below, we hold that the Tax Appeal Court was right, albeit for the wrong reason. *See State v. Taniguchi,* 72 Haw. 235, 240, 815 P.2d 24, 26 (1991).

### A. *Development of Tax Law Regarding "Services"*

#### 1. *Legislative evolution*

■ In 1951, the Territorial Legislature of Hawai'i amended Revised Laws of Hawai'i

(RLH) § 5455.02 (1945), which was subsequently renumbered § 117–16 in 1955, by adding a subsection that introduced the term "intermediary services" to the general tax laws of Hawai'i. RLH § 5455.02(c) (1945, as amended) provided in pertinent part that:

> "[w]here a tire recapper, *photoprinter,* auto paint shop or the like, renders services upon the order of or at the request of another taxpayer who, by reason of constituting an intermediary between the person rendering such services and the ultimate recipient of the benefits of such services, is required to include the rendering of the same services in the measure of the tax levied on him under subsection (f) of section 117–14, so much gross income as is derived from the rendering of such services and shall be subjected to a tax on the person rendering such service...."

(Emphasis added.)[12] As amended in 1963, the renumbered provision, RLH § 117–16(c), provided that:

> [w]here a *photoprinter (or the like),* tire recapper, auto painter or any other person engaged in the business of cleaning, repairing or otherwise restoring to useful service tangible personal property renders services upon the order of or at the request of another taxpayer who, by reason of constituting an intermediary between the person rendering such services and the ultimate recipient of such services, is required to include the rendering of the same services in the measure of the tax levied on him under subsection (f) of section 117–14, or levied on him as a retailer of services under section 117–14.6, so much gross income as is derived from the rendering of such services at the rate of one-half of one per cent and shall be subjected to a tax on the aforesaid intermediary at the rate of three and one-half per cent.

---

**11.** "Photofinishing" is defined as "the commercial development and printing of films usually exposed by amateur photographers." *Webster's Third New International Dictionary* 1702 (Unabridged, 1986). The Tax Director attempts to link "photoprocessing" to both photofinishing and photoprinting as discussed in *Photo Management, supra;* however, Fuji argues that its activities are distinguishable.

**12.** RLH § 117–14(f) (1955) provided that "[u]pon every person engaging or continuing within the Territory in any service business or calling not otherwise specifically taxed in this chapter, there is likewise hereby levied and shall be assessed and collected a tax equal to two and one-half per cent of the gross income of any such business."

(Emphasis added.)[13] Section 117–16(c) was renumbered once again in 1968. *See* HRS § 237–18(c) (1968).

According to the Tax Director, "[i]n 1970, by Act 180, the renumbered HRS § 237–18(c), was *integrated* into HRS § 237–13(6). Act 180 *essentially incorporated the intermediary services provisions of H.R.S. § 237–18(c) into the regular service provisions of HRS § 237–13(6).*" (Emphases added.) However, the legislature specifically amended HRS § 237–13(6) to apply the lower tax rate of one-half percent to *all* businesses that rendered services through an intermediary.[14] *See infra* section II.A.2. (discussing this court's decision in *In re Taxes, Busk Enterprises, Inc.,* 53 Haw. 518, 497 P.2d 908 (1972)). Although HRS § 237–13(6) eliminated reference to "photoprinters (or the like)" as engaging in a service business for the purposes of intermediary service taxation, the Department of Taxation did not change the tax treatment of this activity.

### 2. *Judicial commentary*

Shortly after the 1970 amendment, this court observed that the legislature's action "ma[de] the lower rate applicable to *all service businesses* where an intermediary ordered or requested the service." *In re Taxes, Busk Enterprises, Inc.,* 53 Haw. 518, 520 n. 3, 497 P.2d 908, 910 n. 3 (1972) (citing Hse.Stand.Comm.Rep. No. 108, in 1970 House Journal, at 3) (emphasis added).[15] In other words, *Busk* holds that the legislature *expanded* the previously limited category of service businesses beyond the enumerated categories. *See* HRS § 237–18(c) (1968).

Almost ten years later, this court observed, *in dictum,* that "[t]he use of the term "photo-printer" in provisions that preceded HRS § 237–13(6) (1976) *probably referred to photo-finishing services performed for drug stores which served as retail outlets.*" *In re Photo Management, Inc.,* 63 Haw. 579, 583–84, 633 P.2d 535, 538 (1981) (citing R. Kamins and Y. Leong, *Hawaii's General Excise Taxes* 11 (1963)) (footnote omitted) (emphasis added).[16] Nevertheless, *Photo Management*

---

13. Fuji argues that the 1963 amendment limited intermediary service treatment to businesses involving cleaning, repairing or otherwise restoring tangible personal property. Because its business does not involve such activities, Fuji argues that it cannot be considered a service business.

The Tax Director counters that Hse. Stand. Comm. Rep. No. 1094, in 1963 House Journal, at 882–83, expressly provided:

The present law (section 117–16(c)) imposes a lesser excise tax rate of ½% ... upon certain service business activities when such services are rendered upon the order of or at the request of another taxpayer who is an intermediary. Such activities were intended to include, and are presently so restricted to (*with the exception of photoprinting*), certain types of service activities, namely, the cleaning, repairing or otherwise restoring to useful service of tangible personal property. (Emphasis added.)

*See also* Attorney General's Report to Governor on S.B. No. 1031 (highlighting the *distinct* nature of photoprinting in this context).

14. These businesses included photoprinting, tire recapping, and auto painting, as specifically addressed in RLH § 117–16(c) (1955), as well as other activities, not previously mentioned in that statute, involving services rendered at the request of an intermediary. *See* HRS § 237–18(c) (1968).

15. *Busk* involved a business that cleaned and prepared new cars for delivery by the automobile

dealers to their customers. The question presented was whether such activities should be classified as "wholesaling" (because the taxpayer allegedly provided services to the principal through an intermediary) taxable at one-half of one percent, or at the retail rate of four percent (if there was no intermediary). This court, in *Busk,* held that the recipients of the taxpayer's services were not the car buyers, but the dealers themselves; in other words, their services were not performed at the request of an intermediary. *Id.* at 521, 497 P.2d at 910.

16. The court continued by stating:

Hence, we think the use of the term "photo-printer" was not intended to include photographers per se in the category of "service business or calling." A print sold has no value to the purchaser except as a result of the services rendered by a photo-finisher. In the case of [Photo Management], however, the colored photograph is itself the objective of the transaction.

*Id.* at 584, 633 P.2d at 538.

*Photo Management* involved a business that mass-produced photographs for resale to photo retail companies. Photo Management, Inc. (PMI) asserted that its activities should be classified as "wholesaling," under HRS § 237–4(1), taxable at one-half of one percent (the same rate, at that time, as "intermediary services"). The Department of Taxation assessed additional taxes representing "a change in classification from 'intermediary services' to 'service business or call-

did not expressly hold that the legislature had already classified photofinishers (and photoprocessors) as being engaged, for tax purposes, in a service business as opposed to manufacturing.

Considering the nature of Fuji's photoprocessing operation, *see supra* section I.A., there is evidence in the record to support the conclusion that the industry has undergone a substantial change from a predominantly service-oriented business to a manufacturing enterprise. Nonetheless, the Tax Director argues that its long-standing interpretation of the state's tax laws and the legislature's failure to amend these statutes means that photofinishing (i.e., photoprocessing) should remain classified as a "service business or calling" under HRS § 237-7. *See supra* note 8. However, at least since 1970, Fuji's photoprocessing operations have constituted manufacturing activities.

### B. Development of Tax Law Regarding "Manufacturing"

#### 1. Legislative Evolution

In addition to the generally unsupported assertion that both the legislature and the courts have *"made it clear* that film development is taxable as a service" (emphasis added), the Tax Director specifically counters Fuji's "manufacturing" assertion by stating that "[w]here contemporaneous and practical interpretations made by an administrative agency have stood unchallenged for a considerable length of time, consideration of such interpretations will be regarded as very important at [sic] arriving at the proper construction of a statute." *See* 2 B *Sutherland Statutory Construction* § 49.07 at 62–63 (5th ed. 1992).[17] After close scrutiny, however, it appears that Fuji's photoprocessing activities more appropriately fall within the scope of "manufacturing" as currently contemplated by the legislature.

The predecessor of HRS § 237-13(1)(A), RLH § 117-14(a) (1955), did not contain the term "printing."[18] Such activities apparently were not considered manufacturing until 1970, when the legislature amended RLH § 117-14(a) by adding the word "including" after "manufacturing" and inserting "commercial job printing but not including the printing and publishing of a newspaper" after the word "packing." *See* HRS § 237-13 (Supp.1970). However, in 1977, the legislature removed this limiting language and adopted a form substantially similar to the current statutory provision, HRS § 237-13(1). *See supra* note 3. In other words, the 1970 legislature deleted reference to "photoprint[ing]" from the tax on service businesses and, correspondingly, inserted "commercial job printing [except newspapers]" into the manufacturing category. Therefore, in its current form, the tax on manufacturers applies to all forms of printing.

#### 2. Judicial commentary

In 1959, the Supreme Court of the Territory of Hawai'i adopted a definition of "manufacturing" for tax purposes, which included

ing,' taxable at the rate of four percent under HRS § 237-13(6) (1976)." *Id.* at 581, 633 P.2d at 536–37. The court held that PMI was engaged in the wholesaling business. *Id.* at 584, 633 P.2d at 538.

17. The Department of Taxation offers a 1945 Attorney General's Opinion and departmental reviews in 1976, 1983, 1987, and 1990 as the pertinent "contemporaneous and practical interpretations."

18. RLH § 117-14(a) (1955) provided:

Tax on manufacturers. (1) Upon every person engaging or continuing within the Territory in the business of manufacturing, compounding, canning, preserving, packing, milling, processing, refining or preparing for sale, profit or commercial use, either directly or through the activity of others, in whole or in part, any article or articles, substance or substances, commodity or commodities, the amount of the tax to be equal to the value of the articles, substances or commodities, manufactured, compounded, canned, preserved, packed, milled, processed, refined or prepared, for sale, as shown by the gross proceeds derived from the sale thereof by the manufacturer or person compounding or preparing them (except as hereinafter provided), multiplied by the following respective rates:

Millers or processors of sugar, raw or refined, two and one-half per cent; canneries, two and one-half per cent; all manufacturers on whose gross income a tax is not otherwise levied in this chapter, one and one-half per cent.

the phrase "[t]o work, as raw or partly wrought materials, into suitable forms for use." *Advertiser Publishing Co. v. Fase*, 43 Haw. 154, 157 (1959).[19] Fuji presents a convincing argument (supported by affidavits and other exhibits in the record) that its activities fall within this definition.

In *Photo Management*, this court noted that the "service" aspects of the taxpayer's activity [20] were "merely incidental to and an inseparable part of the transaction and the article or photograph is the substance thereof." 63 Haw. at 583, 633 P.2d at 537. Thus, "the predominant character of the business is the mass production and sale of photographs for purposes of resale." *Id.*[21] In the instant case, any service-related aspects of Fuji's business are similarly incidental, though inseparable, from the underlying transaction. In any event, the predominant character of Fuji's enterprise appears to be the manufacture of photographs [22] and not "wholesaling" as in *Photo Management*.

## III. CONCLUSION

For the foregoing reasons, we affirm the opinion of the Tax Appeal Court.

19. The court held, nonetheless, that newspaper publishing did not constitute manufacturing. *Id.* at 165.

20. *See supra* note 16 (discussing *Photo Management* ).

21. Nevertheless, *Photo Management* observed that

[t]he decision in *In re Taxes, Alexander & Baldwin, Inc.*, 53 Haw. 450, 497 P.2d 37 (1972), does not repudiate consideration of the primary or dominant factors of [Photo Manage-

ment]'s activities to determine the correct classification. The decision maintains that under HRS § 237–14 (1968) the fundamental character of a taxpayer's business does not necessarily determine tax classification; each activity must be examined. Here, however, the fundamental character of [Photo Management]'s business is conclusively wholesaling. *Id.* at 583 n. 5, 633 P.2d at 537 n. 5.

22. *See supra* notes 3 and 4 (quoting from HRS §§ 237–4(2) and 238–2(1)(B)).